UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION


UNITED STATES OF AMERICA,    )  CASE NO:  7:16-CR-00876-11
    )
          Plaintiff,    )      CRIMINAL
    )
    vs.    )    McAllen, Texas
    )
OMAR VAZQUEZ-AVENDANO,    )  Thursday, September 14, 2017
    )   (9:26 a.m. to 9:54 a.m.)
          Defendant.    )


SENTENCING


BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE


Appearances:    See Next Page

Interpreter:    Elena Medrano

Court Recorder:    Rick Rodriguez

Transcribed by:    Exceptional Reporting Services, Inc.
    P.O. Box 18668
    Corpus Christi, TX 78480-8668
    361 949-2988


THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC
EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY
BE USED ONLY AS AUTHORIZED BY COURT ORDER.
UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN
ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.
General Order 94-15, United States District Court,
Southern District of Texas.


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>


**Plaintiff:**                    PATRICIA COOK PROFIT, ESQ.
                                  Assistant United States Attorney
                                  1701 W. Business Hwy. 83
                                  Suite 600
                                  McAllen, TX 78501

**Defendant:**                    GUY L. WOMACK, ESQ.
                                  Attorney at Law
                                  609 Heights Blvd.
                                  Houston, TX 77007

**U.S. Probation Office:**        Rey Garcia
                                  1701 W. Business Hwy. 83
                                  Suite 729
                                  McAllen, TX 78501

1      **McAllen, Texas; Thursday, September 14, 2017; 9:26 a.m.**

2                          **Call to Order**

3          **(Official Interpreter Utilized for Translation)**

4          **THE COURT:**  I'm going to start with 16-cr-00876-11,

5   *USA versus Omar Vazquez-Avendano.*

6          **MS. PROFIT:**  The Government is present and ready,

7   your Honor.

8          **MR. WOMACK:**  Your Honor, Defense is present and

9   ready, Guy Womack for Mr. Vazquez.

10         Your Honor, one of the issues in the case, however,

11  -- well, a couple of issues in the case --

12         **THE COURT:**  Uh-huh (yes.)

13         **MR. WOMACK:**  -- is his role relevant to the Romans

14  and Ramos --

15         **THE COURT:**  Right.

16         **MR. WOMACK:**  -- so it may be easier for your Honor to

17  do them all at the same time.  We don't want to delay.

18         **THE COURT:**  Uh-huh (yes.)

19         **MR. WOMACK:**  I'm not sure we should ever -- for your

20  Honor to take them all in the right sequence.

21         **THE COURT:**  They are going to be all done today, this

22  morning --

23         **MR. WOMACK:**  Well --

24         **THE COURT:**  No, he just needed some time to go over a

25  sentencing issue, not that -- his case is not getting

4

1    continued.

2         **MR. WOMACK:**  We're ready, Judge.

3         **THE COURT:**  All right.  And that is sort of --  I

4    mean, you bring up sort of the bigger issue here is their role

5    relative to each other is significant because it drives some of

6    the points here and so that's why I chose to start with Mr.

7    Vazquez because my perception from reading the Presentence

8    Report is that he -- in the hierarchy on the Chicago side he's

9    fairly high up there, but I know you dispute that and we'll get

10   into that.  Let me ask your client some preliminary questions

11   first.

12        Mr. Vazquez, did you get a chance to review your

13   Presentence Report with your lawyer?

14        **THE DEFENDANT:**  Yes, sir.

15        **THE COURT:**  Do you have any questions about it?

16        **THE DEFENDANT:**  No.

17        **THE COURT:**  I know you disagree about some of the

18   characterization of you, but was everything in the Presentence

19   Report correct about you biographically?

20        **THE DEFENDANT:**  Yes. **(per log notes)**

21        **THE COURT:**  All right.  So, let's see, the third

22   acceptance point off, does the Government move for that point

23   off?

24        **MS. PROFIT:**  Yes, the Government moves for that point

25   off.

1          **THE COURT:**  Which I grant.

2          All right, I don't know where you'd like to begin --

3          **MR. WOMACK:**  Yes, your Honor.  One thing is we

4    believe that if your findings agree with us he'd be eligible

5    for the safety valve and the extra two points there, but --

6          **THE COURT:**  Okay, so -- we'll get to that.  That's

7    dependent on a couple of findings which you're going to have a

8    tough time convincing the Court, but I'm open-minded to hear

9    your version.

10          **MR. WOMACK:**  With regards to leadership --

11          **THE COURT:**  Uh-huh (yes.)

12          **MR. WOMACK:**  -- Mr. Vazquez would buy cocaine from

13    Lechuga.  It would be shipped to Chicago and he would sell it

14    at a profit.

15          The Romans and Ramos were identical.  At the time

16    that Moises Ramos was arrested he, in fact, told the

17    Government, it's in their file, that he had not even seen or

18    had contact with Omar Vazquez for over five years.

19          The Government believes -- and I guess through the

20    government file, the Government had -- the Government has been

21    working very hard and they had done a number of things

22    including getting orders to follow telephones by their GPS

23    tracking.  And in the report they have a specific phone number,

24    they had the order to follow and they said "Oh, that's the

25    phone of Omar Vazquez" and they followed it all over Chicago

1  for a period of days or weeks.  When they finally followed the

2  phone to a house and -- and discovered drugs there and other

3  things it was one of the Roman's, it was their phone.  It was

4  never Omar Vazquez's phone.

5          **THE COURT:**  Uh-huh (yes.)

6          **MR. WOMACK:**  The Government erroneously believed that

7  a person that had been charged to their phone was Omar Vazquez,

8  and they proved scientifically and then audibly on the scene

9  that it was actually one of the Romans that they were -- had

10  their phone the whole time, and they found the phone in his

11  pocket, they found drugs in the house.  I don't remember if it

12  was Jose or Rodrigo, I think it was Rodrigo, but I may be

13  wrong, but it was one of the Romans.

14          **THE COURT:**  Uh-huh (yes.)

15          **MR. WOMACK:**  Your Honor, all of them obtained cocaine

16  and they all sold it --

17          **THE COURT:**  But weren't they --

18          **MR. WOMACK:**  -- but none of them worked for Omar

19  Vazquez.

20          **THE COURT:**  But they were all obtaining their cocaine

21  from Mr. Vazquez or through Mr. Vazquez.  I mean, he -- he's

22  sort of the warehouseman --

23          **MR. WOMACK:**  He didn't --

24          **THE COURT:**  I mean -- I mean, it's always a chain.  I

25  mean, it starts in wherever, Columbia, and here was funneled

1   through Lechuga and his contacts, I mean, his counterpart in

2   Mexico, and they were both distributors so Lechuga had a

3   transportation cell he worked with, maybe more than one cell

4   and he had various distribution networks and my understanding

5   is that Mr. Vazquez was his Chicago distribution network that

6   he would funnel the cocaine up to Mr. Vazquez in Chicago and

7   then Mr. Vazquez would essentially distribute it to people that

8   he knew that could store it and sell it and those were Rod --

9   the Roman brothers, Mr. Ramos, others -- let's see, Mr. Cadena

10  and -- and others.

11          **MR. WOMACK:**  Your Honor, the other two, this Cadena,

12  I think, and maybe Cepeda (phonetic) --

13          **THE COURT:**  Uh-huh (yes.)

14          **MR. WOMACK:**  -- I mean, I may have them wrong, these

15  other two people have never met Omar Vazquez, he doesn't know

16  them and there's no allegation of that.  I think they were from

17  Texas, but they were shipping drugs.  And there are two ways to

18  resolve that -- I mean, to look at this.

19          **THE COURT:**  Uh-huh (yes.)  Well, so let's --

20          **MR. WOMACK:**  Omar Vazquez may have sold some cocaine

21  to the Romans and Ramos, that doesn't make him their leader, he

22  sold to them.

23          And -- and, but overall they were co-equals, the

24  Romans and Ramos were obtaining the drugs from Lechuga -- now

25  maybe it was all shipped to Chicago and they all split it up, I

1    think that's what the evidence shows such as the seizure in

2    June of 2016 where there's 120 kilos, that's Count Five of the

3    Superseding Indictment.

4             **THE COURT:**  Uh-huh (yes.)

5             **MR. WOMACK:**  That 120 kilos, only 20 percent of that,

6    one-fifth of that, was going to Omar Vazquez.  The Government

7    knows this, they know with the debriefings, from their

8    evidence, that 24 kilos out of 120, 24 was going to Omar

9    Vazquez.  He had no interest in the other quantity at all,

10   another 96 kilos.

11            They were co-equals, they weren't -- none of these

12   people worked for him or took directions from Omar Vazquez.

13   That's why the Government would have, and will tell you they

14   have no text messages -- they have millions of text messages,

15   they have none, to my knowledge, between Omar Vazquez and

16   either the Romans or Ramos, they do have between him and

17   Lechuga.

18            **MS. PROFIT:**  Which is very telling, your Honor, the

19   fact that he was in communication with Lechuga and, in fact, I

20   believe that he in -- in these communications had complained

21   about the fact that certain loads had been taken down.

22            And he also, with Lechuga, made plans for taking

23   cocaine to other locations after the Romans had been raided in

24   November, so there's a very close relationship with Mr. Vazquez

25   and Mr. Lechuga that comes through in the text messages.  And

1  it certainly establishes the fact that Mr. Vazquez is not just

2  some simple little supplier, but has a much closer relationship

3  with Lechuga and a much higher relationship in terms of the

4  hierarchy than someone who is just a mere street level

5  distributor.  He was a higher level distributor and the

6  information that we have is that the Romans were working for

7  him.  And Moises Ramos was working for one of the Romans.  So

8  in the hierarchy he was in a higher position.

9         With respect to the 120 keys it's true that the

10  information that we have is that he was only receiving 24 of

11  that particular 120 kilos, but it does not mean that he was no

12  part of and did not have knowledge of a larger conspiracy

13  involving larger quantities of cocaine and --

14         **THE COURT:**  My impression was that that was a mixed

15  load.  I remember the different imprints on the cocaine.  My

16  impression was that maybe it wasn't all Lechugas but the same

17  transportation cell was distributing it, or was it all

18  Lechugas, it just maybe was some of it was Gulf Cartel, some of

19  it was Sinaloa or something, or --

20         **MS. PROFIT:**  I think it came from a variety of

21  places, but I believe that it was all Lechugas.  And that does

22  not account for the fact that we had cocaine that was

23  reassigned, as it were, after the -- after there was the raid

24  at Jose Roman's place in November.  And they sent it to

25  different locations because they were actually expecting more.

1   And that would be Omar Vazquez and that would be Jose Roman.

2           **MR. WOMACK:**  None of which implies leadership, your

3   Honor.  The fact that some --

4           **MS. PROFIT:**  No, but it certainly implies leadership

5   that he is in communications with Lechuga, who's very high up

6   in the command cell, but it's him that he's communicating with

7   directly, and then he had these other individuals that are

8   picking up cocaine.  And when he learns that there has been a

9   raid then he had to take action and advise Lechuga about, that

10  there is heat in that area.

11          **THE COURT:**  I mean, it only takes one subordinate to

12  be a supervisor, it only takes one person under you whom you

13  direct, you know, a driver to unload at a certain location,

14  someone to secure a warehouse.  I have no doubt Mr. Vazquez was

15  directing other people.  He -- he -- as you said, he bought

16  cocaine and was selling it.  Well, he had people that were

17  selling it for him, he's not out himself fencing 24 kilos of

18  cocaine, you know, on the Chicago street corner.  I mean,

19  there's no doubt he's overseeing others in this conspiracy --

20          **MS. PROFIT:**  And he was --

21          **MR. WOMACK:**  But there's no evidence of that, your

22  Honor.

23          **MS. PROFIT:**  Yes, there is evidence of that.

24          **MR. WOMACK:**  Each of the Romans and the -- and I'm

25  not saying it's okay, your Honor, I'm not saying it's all right

1    to buy and sell cocaine.  He's pled guilty to a crime on that.

2         **THE COURT:**  Uh-huh (yes.)

3         **MR. WOMACK:**  But that's why he's not named in any of

4    the other substantive Counts in the Indictment.  He wasn't

5    named in Count Five until the very end.  The Government does

6    not have him touching any of those drugs at all.  These other

7    people were buying and selling cocaine, he was buying and

8    selling cocaine, but there was no evidence of him having any

9    subordinates; in fact there are other people who were

10   dealers --

11        **THE COURT:**  Well, I would like to know his connection

12   to the Romans, I mean, because -- I mean, he's --

13        **MS. PROFIT:**  There is actually a familial connection

14   to the Romans.  There's a familial connection in the sense that

15   he has been described as an uncle, but I don't think that he's

16   actually an uncle, I think he's a second or third cousin, but

17   there is a familial relationship.

18        **MR. WOMACK:**  But --

19        **MS. PROFIT:**  But when you look in terms of the

20   documents you find that the house that's he's living in at one

21   point in time belonged to Rodrigo Roman, and he would --

22   depending on whose story you believe Rodrigo Roman was asked to

23   put that house -- was asked to purchase that house because Mr.

24   Vazquez did not have the kind of credit that would have allowed

25   him to purchase that house.  And then Mr. Vazquez failed to

1    make the payment and happened to be able to purchase the house

2    in his wife's name at a foreclosure sale, but originally the

3    property belonged to -- according to the -- according to the

4    documentary records, belonged to Rodrigo Roman and belonged to

5    -- also belonged to, I think, his father-in-law.

6            **THE COURT:**  But you have no evidence of any

7    communications between these individuals?  I mean, you weren't

8    able to, whatever, go up on the right phones or whatever?

9            **MS. PROFIT:**  We did have -- we do have communications

10   between them, but what we had was, certain samples, we had Jose

11   Roman's number was passed with 100 -- was passed in the March

12   seizures and that's how we were able to establish the March

13   seizures was by setting up on -- setting up on Jose.

14           Now Jose Roman, there is a vehicle that is a Porsche

15   that was found at Mr. Vazquez's house at the time of his

16   arrest, and that Porsche vehicle is -- was registered to Jose

17   Roman and it was not registered to Omar Vazquez, but it was at

18   Omar Vazquez's garage, so there is a relationship between these

19   people and there is a relationship in terms of the drugs.

20           And, frankly, at one point in time they identified

21   Omar Vazquez as being their boss in terms of the earlier

22   statements that they gave.  So when Mr. Womack says that there

23   is no evidence that's not true, there is evidence in terms of

24   the statements of the co-Defendants that Omar was the

25   individual that they were involved with.

1          **MR. WOMACK:**  Your Honor asked a very direct question,

2     was there any evidence of communication and the Government's

3     answer was no, there was not.  A cousin parking his car at

4     one's house does not imply leadership.  The fact that Roman --

5          **THE COURT:**  Well, but it -- but it implies a

6     connection.  I mean, there is -- there is -- they're both in

7     the drug trade, they're both, as you said, distributing or

8     selling drugs that originated from Lechuga and so that's --

9     from --

10          **MS. PROFIT:**  But ironically I believe that that

11    particular Porsche was driven by Mr. Vazquez's wife.

12          **MR. WOMACK:**  I don't know and I really don't care, it

13    doesn't imply leadership, your Honor.  And that's the issue

14    here.

15          **MS. PROFIT:**  This issue --

16          **MR. WOMACK:**  Maybe they are cousins, I think they

17    are, but I don't know what the relation is.  I thought they

18    were uncle and nephew, if they're cousins that's fine, it's

19    familial and the fact that they're co-drug dealers and when

20    they get more than the other or whatever, there's no evidence

21    of any subordinates working for Mr. Vazquez, only other drug

22    dealers who happen to be (indisc.)

23          **MS. PROFIT:**  Your Honor -- your Honor, what he's

24    trying to move away from is the statements of the Defendants

25    engaged through various points in the investigation --

14

1          **THE COURT:**  That they did work for him.

2          **MS. PROFIT:**  -- that Omar was the individual they

3    worked for.  He chose his words when he talked in terms of

4    Moises Ramos very carefully because Moises Ramos, while he had

5    not had direct contact with Omar Vazquez, had had -- believed

6    through Jose Roman that Omar Vazquez was the person that was

7    the supplier.

8          More to the point, Moises Ramos has had a

9    relationship with Omar Vazquez five years before because he was

10   his heroin supplier, and both cocaine and heroin were found

11   with the cocaine -- which is the cocaine that was found with

12   Jose Roman and Moises Ramos also had heroin.

13         **THE COURT:**  All right.  Let's -- what's your next --

14   do you want to talk about --

15         **MR. WOMACK:**  With regards to the firearms, your

16   Honor, I think there were three firearms, I believe, found in

17   the home of Rodrigo Roman.  Again, there is no evidence of Mr.

18   Vazquez ever being in that house --

19         **THE COURT:**  Doesn't need to be.

20         **MR. WOMACK:**  -- ever seeing the firearms, ever

21   knowing there were firearms --

22         **THE COURT:**  Doesn't need to.  Doesn't have to,

23   they're tools of the trade, they're foreseeable.

24         **MR. WOMACK:**  But they weren't just tools of the

25   trade.  To be --

1        **THE COURT:**  Well, he was part of the conspiracy --

2        **MS. PROFIT:**  Your Honor --

3        **MR. WOMACK:**  To be sentenced for that it should be

4   that he knew of them, had something to do with them.  There is

5   no evidence he ever directed someone to have a firearm --

6        **THE COURT:**  You know the law, you don't have to know

7   that the guy in the seat next to you is carrying a concealed

8   weapon when you're dropping off a load of marijuana.  I mean,

9   they're -- guns are always foreseeable in a drug case because

10  they are considered tools of the trade.

11       Now you might still say do you not qualify if you

12  didn't know the weapon, didn't touch the weapon, but it doesn't

13  mean you don't get the enhancements.

14       **MR. WOMACK:**  But here, it's very important, when they

15  searched Mr. Vazquez's home, and Mr. Vazquez has no criminal

16  record, he -- and he's a lawful permanent resident, he could

17  have firearms legally in his home, he had none.  They looked in

18  his vehicles, they looked in his home, he didn't own any

19  firearms and -- I believe that he could have --

20       **THE COURT:**  Uh-huh (yes.)

21       **MR. WOMACK:**  -- but there's nothing to suggest that

22  he caused Rodrigo Roman -- or was even aware he had firearms,

23  and it's not foreseeable that everyone that he know --

24       **THE COURT:**  There is -- I mean, there's probably a

25  dozen Fifth Circuit decisions right on that point, they're --

1   they're tools of the trade, they are foreseeable.

2           **MS. PROFIT:**  Your Honor --

3           **THE COURT:**  No, they don't have to -- if they're

4   there you're out of luck, you're going to get tagged for that

5   enhancement.  Now you may still safety valve qualify, though.

6   You wanted to obviously dispute something --

7           **MS. PROFIT:**  Well, the fact -- well, the fact of the

8   matter is that Rodrigo Roman just recently yesterday told the

9   Government that those guns belonged to Omar Vazquez, and that

10  they --

11          **THE COURT:**  Well, I don't have any evidence of that.

12          **MS. PROFIT:**  I know, but they were brought to the

13  house by Jose -- Jose.

14          **THE COURT:**  Yeah, he's sitting right over here.

15          **MS. PROFIT:**  But -- but beyond that, your Honor --

16          **THE COURT:**  But that would go to safety valve,

17  whether he knew -- specifically knew about them.  But they're

18  always foreseeable.

19          **MS. PROFIT:**  But the -- we also have it in -- and I

20  have told Mr. Womack about this.  We also had a communication

21  between him and Mr. Lechuga when he, as Toro, was going to

22  Mexico City and he specifically asked if Mr. Lechuga could get

23  him a hard one (phonetic), which would be a long gun in Mexico

24  City.  Mr. Lechuga told him "I don't have one over there at

25  this moment."

1        "Anything, but I have to have something within

2   reach," that's Mr. Omar Vazquez.

3        "Yes, let me talk to a buddy to see if he can give

4   you something so that you can carry a short one" which would be

5   a pistol with a permit.

6        So there has been -- in other words when he -- when

7   you say that he has no knowledge of that we do have transcripts

8   that suggest that when -- at least when he was going to Mexico

9   City in terms of drug trafficking that he was looking to

10  prepare himself and to make sure that he had a weapon in Mexico

11  City which Mexico, of course, is -- does not -- does not allow

12  firearms.

13        **MR. WOMACK:**  And that was --

14        **MS. PROFIT:**  And I -- I think that the objection is

15  not well taken in this particular case, and when you say that

16  he has no criminal history I would remind the Court that while

17  Mr. Vazquez has no convictions --

18        **THE COURT:**  Right, convictions, I know, as --

19        **MS. PROFIT:**  -- he has a substantial criminal

20  history --

21        **THE COURT:**  Correct, I'm aware of that.

22        **MS. PROFIT:**  -- in terms of arrests for drug

23  trafficking.

24        **THE COURT:**  I'm aware of that.

25        **MR. WOMACK:**  Your Honor, the context of the firearm

1    thing in Mexico, and the Government and I have discussed it and

2    I think we all agree, that was for his safety --

3              **THE COURT:**  Uh-huh (yes.)

4              **MR. WOMACK:**  -- in Mexico.  None of us would want to

5    go to Mexico unarmed.  I wouldn't want to go unless I had

6    agents with me protecting me and the Government is the same

7    way.  The oil men that go into Mexico never go or send their

8    families to Mexico without having armed guards parading them

9    around town so --

10             **THE COURT:**  All right, so your objection is that it

11   -- the objection is that it wasn't foreseeable that the Romans

12   had weapons involved in -- in drug trafficking and I overrule

13   that objection, it's well settled law in the Circuits that guns

14   are always foreseeable in drug trafficking offenses as they are

15   tools of the trade.

16             **MR. WOMACK:**  And so, beyond that, then the other

17   objections would be that if you ruled in our favor on these

18   where he would otherwise be eligible for the safety valve, he

19   has qualified in all of the other ways --

20             **THE COURT:**  All right.

21             **MR. WOMACK:**  -- and I think the Government would

22   vouch for that.  And so if he were eligible for the safety

23   valve, if these two problems, leadership and firearms didn't

24   disqualify him he would be eligible for the safety valve.

25             **THE COURT:**  Right.  And I'm not suggesting the

1   firearms disqualifies him from safety valve because you can

2   still get the enhancements and be given safety valve points

3   off, I've done that in appropriate cases, but you still get the

4   two point enhancement, though --

5          **MR. WOMACK:**  And we're asking --

6          **THE COURT:**  -- and that's all I'm addressing now is

7   that you do get the two point enhancement.

8          **MR. WOMACK:**  I understand.

9          **THE COURT:**  I don't reach the other safety valve -- I

10  don't need to reach the other safety because I'm also finding

11  that he was a supervisor at a minimum in this large drug

12  trafficking network.

13         **MR. WOMACK:**  And those were the objections that

14  affected the guidelines, your Honor.

15         **THE COURT:**  Correct.  All right, anything else you

16  wanted to add aside from objections that you want to -- I mean,

17  I know a lot about Mr. Vazquez because we had that hearing, but

18  any 3553(a) things you want me to consider?  I did read letters

19  from his children and his spouse.

20         **MR. WOMACK:**  Yes, your Honor, I have some, his wife

21  and his children, his two step-children and his two biological.

22         **THE COURT:**  Yes.

23         **MR. WOMACK:**  And his wife.

24         **THE COURT:**  All right.  So, Mr. Vazquez, you get to

25  speak here before I sentence you.  If there's anything that

1    you'd like for me to consider now is your chance to speak as

2    well.

3            **MR. WOMACK:**  Speak up.

4            **THE DEFENDANT:  (Through interpreter)**  Yes, your

5    Honor.  First of all I ask this country to forgive me for

6    wasting the opportunity that it offered me.

7            And I want to apologize to the Court, I know what I

8    did was really bad and wrong and I'm paying for it.  I ask you

9    to please have some consideration for me, for my family and

10   children.  They need me out there and I'm paying a very high

11   price for my crime.  I ask you for that consideration.  I would

12   like to go back to my family.  I have learned my lessons that

13   (indisc.) and God blessings that this has brought about.

14           **THE COURT:**  All right.  I'm sorry that you made these

15   poor choices as well.  As you know you're going to be deported

16   to Mexico, you'll lose your status to be here.  You're going to

17   have to make a life for yourself in Mexico, and your kids and

18   family will just have to visit you down there.

19           Anything the Government would like to add?

20           **MS. PROFIT:**  Your Honor, we do believe that Mr.

21   Vazquez was a major player in this particular conspiracy.

22           **THE COURT:**  I mean, I appreciate that you have that

23   sentiment.

24           All right, so let me make my findings.  I'm sorry,

25   the third acceptance point, did --

1          **MS. PROFIT:**  I moved for that, your Honor.

2          **THE COURT:**  We did so, even though we had the

3   suppression hearing, we --

4          **MS. PROFIT:**  I -- yes, even though we had a

5   suppression hearing I --

6          **THE COURT:**  I mean, that's rather gratuitous because

7   traditionally that's not what the Government does.  If you have

8   a suppression hearing you lose that third acceptance point.

9          **MR. WOMACK:**  But it's appropriate here, your Honor,

10  under these circumstances.

11         **MS. PROFIT:**  Not necessarily, but at any rate we had

12  agreed to it.

13         **THE COURT:**  A deal's a deal so whatever went into --

14  went into negotiating that I'm not privy to.

15         The Court adopts the factual finding contained within

16  the Presentence Report.  I find it correctly scored after

17  granting off the third acceptance point leaving the Defendant

18  at a Level 35, Criminal History Category I which is a range of

19  168 to 210 months.

20         The Court considers those factors under 18 USC

21  3553(a) and concludes that a sentence within these guidelines

22  satisfies them.  And, therefore, pursuant to the Sentencing

23  Reform Act of 1984, it is the judgment of the Court the

24  Defendant is committed to the custody of the Bureau of Prisons

25  to be imprisoned for a term of 196 months.

1        Upon release from imprisonment the Defendant is

2   placed on supervision for five years, which is mandatory.

3   While on supervision he is not to commit any other Federal,

4   State or local crime.  He's to comply with the standard

5   conditions adopted by this Court, abide by any mandatory

6   conditions required by law.

7        In addition he's not to possess a firearm or other

8   destructive device.

9        He's to cooperate in providing a DNA sample.

10       If deported supervision becomes inactive.  If

11   deported -- if deported during supervision, supervision becomes

12   inactive.  If the Defendant were to return to this country

13   supervision would reactivate automatically at that time and the

14   Defendant would be required to report to the nearest US

15   Probation Office immediately.

16       I find Mr. Roman (sic) can no longer afford to pay a

17   fine so I waive a fine -- I'm sorry, not Mr. Roman, I find the

18   Defendant cannot afford to pay a fine so I waive a fine in his

19   case, but Mr. Vazquez is assessed a $100 special assessment

20   which is payable immediately.

21       All right, he pled to just one Count so it's just a

22   $100 special assessment which is payable immediately.

23       Mr. Vazquez, this is your sentence.  You can appeal

24   it.  You would have two weeks to do so.  If you cannot afford

25   the costs of appeal you could ask that I waive these costs of

1    an appeal.

2            Remaining Counts?

3            **MS. PROFIT:**  The Government moves to dismiss the

4    remaining Counts as to this Defendant, your Honor.

5            **THE COURT:**  So ordered.

6            And I'll recommend he be placed in a facility in the

7    Chicago area as was requested by his family.

8            **MR. WOMACK:**  Thank you, Judge.

9            **THE COURT:**  All right, best of luck to you, sir,

10   and --

11           **MR. WOMACK:**  I didn't catch the number of months?

12           **THE COURT:**  One ninety-six.

13           **MR. WOMACK:**  One ninety-six.

14           **THE COURT:**  Yes.  Did you want to make an additional

15   objection since it wasn't --

16           **MR. WOMACK:**  Well, only that your Honor -- it's not

17   really an objection, but by him pleading guilty, by him coming

18   here before the Court we think you should go lower than the

19   guidelines or even a variance below it.  He is diabetic.  He

20   does have a family and he --

21           **THE COURT:**  Everybody here has family.  I considered

22   him, from everything I read, a major player.  I mean, I know

23   you're trying to minimize his role and that's your role as his

24   Counsel, as his advocate, to minimize it.  I consider him a

25   long time, and based on prior arrests, a long time in the drug

1    trade.  He's been -- the relevant conduct is a fraction of what

2    he's actually done in his lifetime is my belief based on many,

3    many years of overseeing these cases and I think that's a

4    proportionate sentence to what others are going to be getting

5    given his role in this conspiracy.

6         **MR. WOMACK:**  So we would object to that part, your

7    Honor.  We do consider this so-called misconduct for which he

8    was never convicted, never even tried, the cases were

9    dismissed.  You could also take that to mean he was innocent.

10        **THE COURT:**  Absolutely, no doubt.

11        **MR. WOMACK:**  And -- and --

12        **THE COURT:**  I mean, those are not convictions.

13        **MR. WOMACK:**  -- involved several years would be -- if

14   the government followed (indisc.) he was (indisc.)

15        **MS. PROFIT:**  Your Honor, even as a practical matter

16   in this particular case they're focusing on the amount of dope

17   at the scene.  And during the course of the trial there was

18   testimony that this organization was involved with 300 to 500

19   kilos of cocaine a week, and we know from the intercepts that

20   there was far more cocaine that was going to Chicago.

21        **THE COURT:**  I only held him responsible for the

22   relevant conduct identified in the Presentence Report and

23   that's why he was at a Base Offense Level of 34.  I could have,

24   I believe, concluded relevant conduct was at a Base Offense

25   Level of 38, I did not.  This was within the Guideline

1    sentence.

2            **MR. WOMACK:**  We understand that, your Honor, and it's

3    just that -- as your Honor knows typically when someone does

4    plead guilty often they -- you know, the Guidelines consider --

5    consider all of the amount --

6            **THE COURT:**  Yes.  Yes.

7            **MR. WOMACK:**  -- you know, (indisc.) 168 frankly would

8    be too much and 196 is another three years on top of that.

9            **THE COURT:**  I -- just given his significant role and

10   my desire to give proportionate sentencing, that's, I felt was

11   the correct sentence based on all of the 3553(a) factors and,

12   again, it was within Guidelines.

13           All right, best of luck to you, sir, and you are

14   excused at this time.

15           **MR. WOMACK:**  Thank you, your Honor.

16       **(This proceeding was adjourned at 9:54 a.m.)**

17

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    December 5, 2017_

TONI HUDSON, TRANSCRIBER